*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name:  09a0356p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————

LAWRENCE REYNOLDS,

*Plaintiff-Appellant,*

*v.*

TED STRICKLAND, et al.,

*Defendants-Appellees.*

No. 08-4144

————————

Decided and Filed:  October 5, 2009

Before:  MARTIN, COLE, and SUTTON, Circuit Judges.

————————

**ORDER**

————————

BOYCE F. MARTIN, JR., Circuit Judge.  Lawrence Reynolds, an inmate on death

row in the State of Ohio, has moved for a stay of his execution, currently set for October 8,

2009.  Reynolds' current motion is based on an Eighth Amendment challenge to the Ohio

lethal injection protocol.  As a general proposition, this claim is currently barred by the two-

year statute of limitations that we put in place in *Cooey v. Strickland* (*Cooey II*), 479 F.3d

412 (6th Cir. 2007), *reh'g denied en banc*, 489 F.3d 775 (6th Cir. 2007).  However, after we

decided *Cooey II*, Ohio revised its execution protocol in May 2009 and experienced serious

and troubling difficulties in executing at least three inmates, most recently Romell Broom.

These disturbing issues give rise to at least two questions:  first, whether Ohio is fully and

competently adhering to the Ohio lethal injection protocol given (a) their failure to have a

contingency plan in place should peripheral vein access be impossible, (b) issues related to

the competence of the lethal injection team, and (c) other potential deficiencies; and second,

1

No. 08-4144        *Reynolds v. Strickland, et al.*                    Page 2

whether these instances present sufficient new, additional factors to revive Reynolds' Eighth Amendment claims otherwise extinguished by *Cooey II*.

Broom's arguments about these very issues will be heard before the Honorable Gregory Frost of the United States District Court of the Southern District of Ohio; to permit this, his execution has been stayed until at least November 30, 2009.  Given the important constitutional and humanitarian issues at stake in all death penalty cases, these problems in the Ohio lethal injection protocol are certainly worthy of meaningful consideration.  Judge Frost is best positioned to conduct a comprehensive review of these issues for both Reynolds and Broom.

For the foregoing reasons, we hereby GRANT Reynolds' motion for a stay of execution and REMAND his case to Judge Frost for fact-finding and evidentiary hearings on the merits of his arguments.

No. 08-4144          *Reynolds v. Strickland, et al.*                    Page 3

COLE, J. concurring.   Although I fully agree with the Court's order, I write separately to address a number of issues raised by the dissent.

The dissent argues that the State's eighteen unsuccessful efforts to run an intravenous line into Romell Broom's veins over the course of two hours demonstrates the sensibility of Ohio's execution protocol because the State ultimately halted the execution attempt.   The argument continues that, if the same problems arise during Reynolds' execution, this execution similarly would be stopped.   Thus, the likelihood that he would ultimately prevail in his § 1983 claim is too slim to warrant a stay of execution.   This argument misses the mark.

Preliminarily, it overlooks the possibility that Broom has already suffered an Eighth Amendment violation by being subjected to this failed execution attempt.   Even if Reynolds' execution similarly was halted partway through, at that point he already may have suffered constitutional harm under Ohio's protocol.   Although the details of the failed Broom execution have not yet fully emerged, the initial reports suggest that the execution attempt could provide uniquely relevant evidence in support of the proposition that there is a "demonstrated risk of severe pain" under the revised Ohio protocol.   *See Baze v. Rees*, — U.S. —, 128 S.Ct. 1520, 1537 (2008).

The failed Broom execution raises concerns about the risks of maladministration under the Ohio protocol, and its intravenous siting provisions in particular.   Ohio's protocol allows for "as much time as is necessary to establish two [intravenous] sites" and the changes specifically grant the execution team members discretion in deciding if and when to abandon such efforts if problems arise.   Reynolds raised concerns about the discretion granted to the

No. 08-4144        *Reynolds v. Strickland, et al.*                    Page 4

execution team by the May 2009 revisions prior to the failed Broom execution and has argued that the risks presented by maladministration are part of his "core complaints." That, in the interim, the State's procedures further were called into question increases both the likelihood that Reynolds could ultimately succeed on the merits of his § 1983 claim and the likelihood that, if no stay were to be granted, he would be harmed irreparably.

The dissent also emphasizes that Ohio revised its protocol precisely to alleviate Eighth Amendment concerns. While I have no doubt that Ohio did not revise its execution protocol in order to make executions more cruel or unusual, the State's intent is not at issue. The question is whether the changes to the protocol amount to a factual predicate sufficient to revive Reynolds' Eighth Amendment challenge under *Cooey II*. Even given the two previous instances when Ohio ran into difficulties administering its lethal injection protocol, the halting of Broom's lethal injection operation prior to its completion was unprecedented. This event only strengthens Reynolds' argument that the May 2009 changes sufficiently raised the risks of maladministration to revive his claims.

Finally, the dissent argues that "the Constitution allows the people to make policy mistakes, . . . and correct them for themselves over time, and we should let that process run its course . . . ." However, in considering a motion for a stay of execution, we must balance both the likelihood that the prisoner will prevail on the merits and the likelihood that, if no stay is granted, irreparable harm will occur. Indeed, the State has agreed not to attempt another execution of Broom until the district court can reconsider the matter. In this context, where allowing the process to run its course could result in the severest of consequences, it is more prudent to allow the district court to take these new circumstances into consideration.

No. 08-4144        *Reynolds v. Strickland, et al.*                              Page 5

SUTTON, Circuit Judge, dissenting.  I have some sympathy for my colleagues' position on this stay motion, but I cannot bring myself to join them.

One way to look at Reynolds' request for a stay—and the only way to look at his underlying appeal—is that it is based on a false premise.  He claims that *Cooey II* was wrongly decided and claims that we, as a three-judge panel, can overrule or sidestep the decision of a prior panel.  In that sense, his position is no different from the position of the capital defendant in *Getsy v. Strickland*, 577 F.3d 309 (6th Cir. 2009), where we rejected all of the *Cooey II* arguments that Reynolds raises in his underlying appeal.  One panel cannot overrule another panel.

Another way to look at Reynolds' stay motion—though not his underlying appeal—is that he seeks to make a new argument not addressed in *Getsy*.  His § 1983 claim is not time barred, the argument goes, because, after he filed his appellate briefs, the State attempted to execute Romell Broom on September 15, 2009, the execution team was unable to access a usable vein on Broom after two hours, and at that point the State postponed Broom's execution "to allow the Department [of Rehabilitation and Correction] to recommend appropriate next steps to" Governor Strickland.  Ted Strickland, Warrant of Reprieve (Sept. 15, 2009).  Because *Cooey II* suggests that the statute of limitations period may start anew when the execution "protocol . . . change[s]" in a way that "relate[s]" to the petitioner's "core complaints," *Cooey v. Strickland (Cooey II)*, 479 F.3d 412, 423 (6th Cir. 2009), Reynolds claims that his § 1983 claim is not time barred.  But, as far as the record and the parties' papers show, nothing has changed since September 15th, at least nothing that would suggest the State has changed its protocol in a way that risks needless harm to

Reynolds.  Because the State has not materially altered its protocol, Reynolds has no perch from which to argue that he is challenging a new procedure.

All of this explains why I cannot vote in favor of a stay in Reynolds' case at the panel stage.

But none of this would prevent me from urging the full court to consider Reynolds' claim, to reconsider whether *Cooey II* was rightly decided and to grant a stay in the interim. I doubt the value of that approach, however, for three reasons.  One, while *Cooey II* is not beyond reproach, I have yet to hear a demonstrably better suggestion for determining when the limitations period should start.  The *Cooey II* panel dealt with a legal issue for which there was little, if any, statutory guidance, and as a result it borrowed a limitations rule from a related area—habeas corpus—that must account for the same kinds of problems associated with eleventh-hour litigation and relitigation that frequently accompany challenges to execution protocols.  *Id.* at 421 (analogizing to habeas corpus based on the same need for "timely enforcement of [the] sentence" and "protect[ing] States from dilatory or speculative suits") (quotation marks omitted).  That assuredly was a reasonable choice, even if it remains a choice open to second guessing, as invariably will be the case when there is no direct statutory guidance at hand.

Two, even if there may be other sensible ways to handle the accrual issue, that does not necessarily make a stay appropriate (or for that matter warrant reconsideration of *Cooey II*).  In the context of a stay motion, there is no difference between a time-barred claim and a non-time-barred claim if both claims have the same slim prospect of success.  One does not grant a stay to hear a claim, whether it contains a procedural defect or not, if the underlying

claim has little chance of success on the merits.  That is precisely Reynolds' problem.  The objective of this § 1983 lawsuit is to challenge Ohio's underlying execution protocol.  Yet, in *Baze v. Rees*, ___ U.S. ___, 128 S.Ct. 1520 (2008), the Supreme Court rejected an Eighth (and Fourteenth) Amendment challenge to Kentucky's three-drug protocol for executing capital defendants.  In all material respects, Ohio and Kentucky have the same procedure, making it exceedingly unlikely that Reynolds could succeed where Baze failed.  Making matters worse for Reynolds, Ohio has changed its procedure since *Baze*, all in ways designed to make the wrenching task of executing an individual more humane.  (More on that below.)  Since we must start with the presumption that Ohio's execution protocol is constitutional, shouldn't we end with that presumption if the United States Supreme Court has approved a materially identical procedure?

The *Baze* plurality opinion seems to think so:

> A stay of execution may not be granted on grounds such as those asserted here unless the condemned prisoner establishes that the State's lethal injection protocol creates a demonstrated risk of severe pain.  He must show that the risk is substantial when compared to the known and available alternatives.  A State with a lethal injection protocol substantially similar to the protocol we uphold today would not create a risk that meets this standard.

*Id.* at 1537.

Three, the only path left to capital inmates after *Baze* is narrow, one that Reynolds cannot take and one that suggests the significance of *Cooey II* is overrated.  Even after *Baze*, a capital inmate may show that a three-drug execution protocol is "cruel and unusual" under the Eighth Amendment if it intentionally or recklessly imposes needless harm on the individual—if, to borrow from *Baze*, the inmate has "demonstrate[d] an 'objectively

No. 08-4144          *Reynolds v. Strickland, et al.*                    Page 9

intolerable risk of harm' that officials may not ignore." *Baze*, 128 S.Ct. at 1531 (plurality) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 (1994)).  Nothing in the record or in Reynolds' papers suggests that Ohio's protocol on its face falls within this narrow category, and *Baze*'s approval of the Kentucky procedure strongly suggests it does not.

That, however, does not preclude an inmate from showing that, as applied to him and as applied to other like-situated individuals, the procedure comes within the narrow *Baze* exception.  An inmate who shows that a State has made detrimental changes to its procedure after the original accrual of his §1983 claim, or who shows defects in the procedure revealed by an "objectively intolerable risk of harm" imposed on similarly situated individuals after the accrual date, not only might have a cognizable *Baze* claim but also would seem to fit within the exception to *Cooey II*.  The State, I suspect, would agree.  Were a cruel and unusual feature of Ohio's protocol suddenly revealed during an execution, I firmly doubt the State would press ahead with the next execution solely on the ground that the capital defendant should have filed his § 1983 claim several years earlier.  I, for one, would not construe *Cooey II* to tolerate state action to the contrary.

The larger question, then, is not whether *Cooey II* was rightly decided; it is whether Reynolds has a cognizable *Baze* claim with any prospect of success.  Reynolds' key argument in that respect turns on the recent failed Broom execution, namely the failure of the State to establish a workable IV within two hours and its decision to postpone the execution at that point.  I am not persuaded.

Here is what Ohio's protocol has to say on the point:

> The team members who establish the IV sites shall be allowed as much time as is necessary to establish two sites.  If the passage of time and the difficulty of the undertaking cause the team members to question the feasibility of two or even one site, the team will consult with the warden. The warden, upon consultation with the Director and others as necessary, will make the decision whether or how long to continue efforts to establish an IV site.  The Director shall consult with legal counsel, the office of the Governor or any others as necessary to discuss the issues and alternatives.

Ohio Dep't of Rehabilitation and Correction Policy Directive No. 01-COM-11, ¶ VI.B.7.f

(Effective May 14, 2009).

It is difficult to challenge the wisdom of allowing the State to postpone an execution when "the passage of time and the difficulty of the undertaking" cause the State "to question the feasibility" of establishing the IV lines.  Created in May 2009, this option was designed to correct a problem that emerged during a prior execution, the Clark execution, in which the State also had trouble running an IV line on the inmate.  The option is as sensible as it is humane.  Viewed from this perspective, the  Broom execution may have "failed" by one measure because Broom was not executed.  But, by another measure, the Governor's decision not to proceed with the execution of Broom, after two hours of attempting to run IV lines on him, confirms the virtue of the procedure and the Governor's responsible behavior in implementing it.  The postponement option is designed to avoid "cruel and unusual" punishment, not to further it.  That is why Reynolds' reliance on the number of failed efforts to run a needle/IV line into one of Broom's veins—18 in total—does not help him.  It instead shows why the Governor sensibly called off the execution and proves he would do the same if Reynolds ran into a similar problem.  Why assume an execution protocol is unconstitutional when one of the humane features of the protocol—that the State

No. 08-4144         *Reynolds v. Strickland, et al.*                    Page 11

will not continue trying to access a usable vein beyond a sensible time limit—is being followed?

What, moreover, is a better "alternative[]"? *See Baze*, 128 S.Ct. at 1537 (plurality) (a stay of execution requires "show[ing] that the risk is substantial *when compared* to the known and available alternatives") (emphasis added). Reynolds argues that the Broom execution attempt proves that Ohio's protocol is unconstitutional and that Ohio's execution team is "complete[ly] incompeten[t]." Supp. Br. 6. But he offers no alternatives. He does not argue that the Governor should stop a delayed execution in less than two hours. He does not argue that the State should try to run an IV line earlier or test whether a capital defendant's veins are accessible before the execution date, and he has not requested that the State try either approach with him. He does not claim that he has the same kind of inaccessible-vein problem that Broom has. And he does not explain why EMTs may not oversee this process or what should be done instead given the understandable reluctance of other members in the medical profession to assist the effort. Keep in mind that the Kentucky protocol uses EMTs, and *Baze* approved that approach, in part because the "qualifications" of EMTs "substantially reduce the risk of IV infiltration." *Id.* at 1534; *see also id.* at 1539 (Alito, J., concurring) ("[A] suggested modification to a lethal injection protocol cannot be regarded as 'feasible' or 'readily' available if the modification would require participation . . . by persons whose professional ethics rules or traditions impede their participation.").

The Broom experience in the end simply does not validate Reynolds' claim. Calling off an execution after two hours because the State could not run the requisite IV lines does not show that the State's protocol violates the Eighth Amendment. What the Broom

experience shows, and what the Clark and Newton experiences before that show, is that the State's EMTs have a difficult time running IV lines on some individuals. But we now know what happens when that is the case: The Governor will stop the execution after two hours. That approach removes the foundation for an Eighth Amendment claim; it does not lay the groundwork for one. Surely it would be better, at least by one way of looking at it, if the prison's EMTs could run IV lines on anyone and everyone. Other members of the medical profession, however, understandably wish to focus on assisted living, not assisted dying (or executing). And it is difficult to maintain that the elected officials in a State may not continue to implement a death penalty when they have developed a sensible remedy for the key problem on the table: an inability to access veins in some individuals. *See Baze*, 128 S.Ct. at 1529, 1531,1537 (plurality).

The last problem with Reynolds' motion for a stay is that there is no way to grant it without effectively imposing a moratorium on implementing the death penalty in Ohio. Reynolds has not argued or shown that he has difficult-to-access veins, as Broom does. There thus is nothing unique about his case that suggests a special as-applied problem that warrants a stay in his case, as opposed to any other. *See id.* at 1529 ("We begin with the principle, settled by *Gregg*, that capital punishment is constitutional. It necessarily follows that there must be a means of carrying it out. Some risk of pain is inherent in any method of execution—no matter how humane—if only from the prospect of error in following the required protocol." (citation omitted)).

No doubt, the Governor himself has the right to impose a moratorium. And a case could be made that it would be reasonable to do so. But the question is whether the Eighth

No. 08-4144          *Reynolds v. Strickland, et al.*                                Page 13

Amendment requires the Governor to take this approach.  A reasonable thing to do is not necessarily a constitutionally mandated thing to do.  *See id.* at 1538 ("Throughout our history, whenever a method of execution has been challenged in this Court as cruel and unusual, the Court has rejected the challenge.  Our society has nonetheless steadily moved to more humane methods of carrying out capital punishment.").

   As an individual, I might prefer to live in a State that does not have a death penalty or at least one where it is less frequently imposed.  But the Constitution allows the people to make policy mistakes, if policy mistakes they are, and correct them for themselves over time, and we should let that process run its course unless or until their representatives cross a cognizable constitutional limit.  That is particularly so in the area of capital punishment, where the Supreme Court has long "tolerated continuity" and "the democratic processes" nonetheless frequently have "demanded change."  *Workman v. Bredesen*, 486 F.3d 896, 907 (6th Cir. 2007).

                                        ENTERED BY ORDER OF THE COURT

                                        /s/ Leonard Green
                                        _____
                                                       Clerk

# UNITED STATES COURT OF APPEALS
### FOR THE SIXTH CIRCUIT

Leonard Green
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: October 05, 2009

Mr. Gregory William Meyers
Ohio Public Defender's Office
250 E. Broad Street
Suite 1400
Columbus, OH 43215

Ms. Kimberly Sue Rigby
Ohio Public Defender's Office
250 E. Broad Street
Suite 1400
Columbus, OH 43215

Mr. Charles L. Wille
Office of the Ohio Attorney General
150 E. Gay Street
16th Floor
Columbus, OH 43215

Re: Case No. 08-4144, *Lawrence Reynolds v. Ted Strickland, et al*
Originating Case No. : 08-00442

Dear Counsel,

Enclosed is a copy of an order filed today designated for full-text publication in the above-styled case.

Yours very truly,

Leonard Green, Clerk

Deputy Clerk

cc:  Mr. James Bonini

Enclosure